# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PARTNERS HEALTHCARE SOLUTIONS HOLDINGS, L.P. and GTCR FUND IX/A, L.P., <br><br> Plaintiffs, <br><br> v. <br><br> UNIVERSAL AMERICAN CORP., <br><br> Defendant. | ) ) ) ) ) ) ) ) C.A. No. 9593-VCG ) ) ) ) ) |

## MEMORANDUM OPINION

Date Submitted: March 4, 2015
Date Decided: June 17, 2015

Jon E. Abramczyk and Ryan D. Stottmann, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Reed S. Oslan, P.C., Scott A. McMillin, P.C., and Richard U. S. Howell, of KIRKLAND & ELLIS LLP, Chicago, Illinois, *Attorneys for Plaintiffs*.

Blake Rohrbacher and Andrew J. Peach, of RICHARDS, LAYTON & FINGER, P.A, Wilmington, Delaware; OF COUNSEL: Andrew J. Levander, Linda C. Goldstein, Paul C. Kingsbery, and Amanda N. Tuminelli, of DECHERT LLP, New York, New York, *Attorneys for Defendant*.

GLASSCOCK, Vice Chancellor

As a result of a merger, one entity, Plaintiff Partners Healthcare Solutions Holdings, L.P. ("Partners"), became a large stockholder of a second entity, Universal American Corp. ("UAM"), and, pursuant to an agreement between these entities, Partners became entitled to designate a director to the board of UAM (the "Board"). The two entities then became adversaries in litigation. After its initial designee resigned, Partners sought to have a successor designee seated. UAM was willing to seat the designee, but only if he signed a confidentiality agreement and forwent representation as a director by the same law firms representing Partners, which had nominated him, in the litigation against UAM. In other words, the board of UAM insisted that its director not be assisted in that fiduciary role by counsel with an interest adversary to UAM. The designee refused to accede to this request, and Partners sued UAM, arguing that UAM was in breach of certain of the parties' agreements for refusing to seat the designee. Partners sought specific performance—seating of the designee without conditions—and damages.

George Orwell pointed out that "[t]o see what is in front of one's nose needs a constant struggle."[1] During the pendency of the litigation, the parties underwent that struggle, and settled the specific performance portion of the action by seating the designee subject to litigation counsel erecting an ethical wall separating that litigation from those members of the law firm representing the designee in his

---

[1] George Orwell, "In Front of Your Nose," *Tribune*, March 22, 1946.

fiduciary capacity. Partners has continued this litigation, however, in a quixotic attempt to secure damages (and contractual attorney fees) allegedly arising during the months between the designation and the parties' epiphany regarding the ethical wall, that is, during the time when Partners had no designee on UAM's board. UAM has moved for summary judgment, to which I find, for the reasons below, it is entitled.

## I. BACKGROUND FACTS

*A. The Merger and the Board Seat Agreement*

On March 2, 2012, Partners, a limited partnership created by private equity firm GTCR, LLC ("GTCR"), entered into a merger agreement (the "Merger Agreement") with UAM. Pursuant to the Merger Agreement, UAM purchased Partners Healthcare Solutions, Inc. ("Sub"), Partners' subsidiary, and Partners became one of UAM's largest stockholders.

By way of a letter agreement (the "Board Seat Agreement"), Partners also received a seat for its designee (the "Designee") on UAM's Board. In the Board Seat Agreement, the parties agreed that the Designee must be "independent" under stock exchange rules and that Partners and co-Plaintiff GTCR Fund IX/A, L.P. ("Fund IX/A")[2] would have the right to designate a successor should their initial

_____

[2] Fund IX/A and GTCR Fund IX/B, L.P., like Partners, are controlled by GTCR.

Designee resign.[3]  The Board Seat Agreement also included "Management and Information Rights" for Fund IX/A and non-party GTCR Fund IX/B, L.P. ("Fund IX/B")[4] "for so long as [the Plaintiffs, among others] continue to hold at least 5% of the outstanding shares of [UAM] Common Stock."[5]

---

[3] The Board Seat Agreement provides, in Paragraph A.1:

> The Company hereby acknowledges and agrees that one director designated by [Fund IX/A] who shall satisfy the criteria for "independent director" under the rules of the principal stock exchange on which [UAM] Common Stock is listed . . . , shall be appointed to the board of directors of [UAM] effective as of the date hereof.  Fund IX/A has previously designated David Katz as its initial [Partners] Designee.  Subject to Paragraph A.2, commencing on the date of this Letter Agreement and in accordance with the Amended and Restated Certificate of Incorporation and Amended and Restated By-Laws of the Company, at each annual meeting of the stockholders of [UAM] . . . , [UAM] shall nominate for election to the Board one [Partners] Designee, to be included in the slate of directors recommended by the Board to the Stockholders for election.

Aff. of Linda C. Goldstein, Esq. in Supp. of Def.'s Mot. for Summ. J. ("Goldstein Aff.") Ex. 3 § A.1.  The agreement further provides:

> Subject to the other provisions of this Section A, if, as a result of the death, retirement, resignation or removal for cause of the [Partners] Designee, there shall exist or occur any vacancy on the Board, Fund IX/A shall have the power to designate a person to fill such vacancy.

*Id.* § A.3.

[4] *See supra* note 2.

[5] *Id.* § B.1.  These rights include, among other things, the right of Fund IX/A and Fund IX/B to receive from [UAM] any written information or written materials provided by [UAM] to members of the Board; *provided* that the VCOC Fund [(defined as Fund IX/A and Fund IX/B, together)] receiving such information shall agree to maintain the confidentiality of such information.  Notwithstanding anything herein to the contrary, [UAM] reserves the right to exclude each VCOC Fund or its designated representatives (other than those that may otherwise serve on [UAM's] Board of Directors) from access to any personnel, materials or meetings to the extent . . . reasonably necessary to preserve the attorney-client privilege . . ., to protect highly confidential proprietary information (unless such VCOC Fund and its designated representatives enter into a customary confidentiality agreement reasonably satisfactory to [UAM]); provided, that the foregoing [UAM] right of exclusion shall pertain only to access granted by [UAM] pursuant to this letter agreement and shall not limit or restrict rights the VCOC Fund may otherwise enjoy.

*Id.* § B.2.

As indicated in the Board Seat Agreement, Partners named David Katz, a Managing Director of GTCR and former board member of Partners,[6] as its initial Designee on the Board.

According to UAM, "Practically from the moment the merger closed, [Sub's] performance was abysmal."[7] UAM contends that, although two days before closing Sub's management confirmed that it was on track for its 2012 budget of approximately $45 million EBITDA, within six weeks of closing, Sub's forecast was revised downwards by 40%; within four months, the forecast was down 90%.[8] On March 1, 2013, UAM sent a demand for indemnification to Partners, addressed to Katz and a third party.[9] In settlement negotiations that began shortly thereafter, Katz, while still a director of UAM, acted on behalf of GTCR.[10] GTCR was also assisted by legal counsel, attorneys from the firm of Kirkland & Ellis ("K&E").[11]

Katz remained on the Board during the ongoing negotiations between GTCR—the entity with which he was affiliated, and for which he was negotiating—on the one side, and UAM—the company for which he was a fiduciary—on the other. His name was included on the slate of nominees

---

[6] Goldstein Aff. Ex. 12 ¶ 10.
[7] Opening Br. in Supp. of Def.'s Mot. for Summ. J. at 9.
[8] *Id.*
[9] Goldstein Aff. Ex. 9.
[10] Goldstein Aff. ¶¶ 2–3.
[11] *Id.* ¶ 3.

4

recommended to UAM stockholders at the May 2013 annual meeting, at which he was reelected.[12]

By October 2013, settlement talks ended and UAM filed a complaint in the United States District Court for the District of Delaware asserting, among other things, fraud claims arising out of the sale of Sub to UAM (the "Fraud Litigation").[13] The defendants named in the Fraud Litigation include, among others, Partners, Fund IX/A, former officers of Sub, and Katz. The defendants were represented in the litigation by K&E and Morris, Nicholas, Arsht & Tunnell ("MNAT").

The Board created a special committee, which did not include Katz, to address the Fraud Litigation. In January 2014,[14] the day before a Board meeting at which UAM's "2014 plan and other items" would be discussed, UAM requested that Katz sign a confidentiality agreement.[15] That agreement provided, among other things, (1) that information learned as a UAM director would be used only in connection with that role, and explicitly that such information would not be used in the Fraud Litigation; (2) that Katz would not share non-public information concerning UAM with any third parties, explicitly including K&E; and (3) that he

---

[12] Goldstein Aff. Ex. 11.
[13] *See* Goldstein Aff. Ex. 12.
[14] It is not clear from the record whether there were any board meetings between the initiation of the Fraud Litigation in October 2013 and the January 2014 meeting.
[15] Transmittal Aff. of Ryan D. Stottmann ("Stottmann Aff.") Ex. 19.

would only share non-public information with GTCR employees on a need-to-know basis.[16]

Katz proposed a revised version of the confidentiality agreement in which he would agree not to use anything he learned as a UAM director in the Fraud Litigation and to keep UAM's non-public information confidential.[17] He did not, however, agree to the more explicit restriction on sharing information with GTCR employees or the restriction on sharing information with counsel at K&E.[18] Ultimately, the morning of the Board meeting, Katz executed his proposed version and attended the meeting.

A few weeks later, on February 11, 2014, UAM again requested Katz execute its version of a confidentiality agreement, and noted this would supersede Katz's earlier version. UAM's proposed version provided that Katz would not use K&E or MNAT—counsel to Partners and GTCR as counterparties to UAM in the Fraud Litigation—"in connection with fulfilling [his] duties as a director" of UAM.[19] Katz refused to execute that agreement, and continued to serve on the Board until March 20, 2014, when he resigned as a director of UAM.[20]

---

[16] *Id.*
[17] Stottmann Aff. Ex. 20.
[18] *Id.*
[19] Stottmann Aff. Ex. 22.
[20] The record is not clear as to whether there were any Board meetings between Katz's refusal to execute the confidentiality agreement in February and his resignation in March.

*B. The Second Board Designee*

That same day, Fund IX/A designated George Sperzel to fill Katz's vacancy.[21] He confirmed his independence under the New York Stock Exchange Rules[22] and counsel at K&E, on his behalf, requested information in connection with the upcoming board meeting scheduled for March 24, 2014.[23] UAM did not provide the requested information and met without Sperzel. The Board meeting minutes indicate that "[t]he Board discussed Mr. Sperzel's background and would consider the merits of his appointment to the Board at an upcoming meeting after Mr. Sperzel had consented to and went through applicable background checks and completed all necessary paperwork, including executing appropriate confidentiality agreements."[24]

On March 26, UAM presented Sperzel with a confidentiality agreement, pursuant to which he would agree not to share UAM's confidential information with any third party "other than counsel in connection with fulfilling [his] duties as a director, which counsel may not include [K&E] or [MNAT] or any other counsel representing GTCR or the other defendants in the [Fraud Litigation]."[25] Sperzel instead executed an agreement similar to the one signed by Katz in January 2014,

[21] Stottmann Aff. Ex. 27.
[22] Stottmann Aff. Ex. 29.
[23] Stottmann Aff. Ex. 30.
[24] Stottmann Aff. Ex. 31.
[25] Stottmann Aff. Ex. 32 at UAM-BRL 00001519.

which did not restrict his choice of counsel or otherwise prohibit sharing UAM information with K&E or MNAT.[26] Sperzel's decision to use K&E to represent him in his fiduciary capacity was dictated by GTCR.[27] Following a series of communications, throughout which neither party was willing to compromise, Partners filed its Complaint in this action on April 29, 2014, seeking specific performance. Sperzel was not included on the Board-recommended slate of directors at the May 28, 2014 annual meeting.

Ultimately, with what appears to have been substantial effort, the parties reached a settlement that, in hindsight, appears obvious: Sperzel was seated on the Board, subject to a confidentiality agreement. That agreement provided that, while Sperzel could use K&E and MNAT as counsel in his capacity as directors, those firms would erect ethical walls to mitigate the potential for conflicts of interest given their representation of Partners and GTCR, the defendants in the Fraud Litigation.[28] UAM provided Sperzel and GTCR, which had by that time also

---

[26] *See* Stottmann Aff. Ex. 34.

[27] *See* Goldstein Aff. Ex. 20 at 71:10–73:5.

[28] While this answer may appear obvious, both parties, in their briefing, point to their counterparty's failure to suggest that K&E and MNAT establish ethical walls. *See* Opening Br. in Supp. of Def.'s Mot. for Summ. J. at 13–14 ("Not once during these exchanges did Plaintiffs offer that K&E might set up an ethical wall to protect [UAM's] confidences from the litigators who were defending Plaintiffs against Universal's fraud claims. Nor did they give any sign that they even understood the conflict of interest inherent in K&E serving as counsel to both Plaintiffs, which were adverse to Universal, and to a [UAM] director who would be privy to [UAM's] confidential information."); Pls.' Answering Br. in Opp'n to Def.'s Mot. for Summ. J. at 19 ("As during the parties' discussions of Katz's confidentiality agreement, UAM never suggested that K&E or MNAT establish an ethical wall to separate the attorneys who could advise Sperzel in connection with his board duties.").

executed a confidentiality agreement, all written information that had been provided to the Board since March 20, 2014, excluding materials that were provided to the special committee established for the Fraud Litigation.

*C. The Cap Z Transaction*

The Board met eight times between the time Katz resigned (the same day that Sperzel was designated as his replacement) and November 14, 2014, the date on which Sperzel was elected by the Board to serve as a director, pursuant to the parties' settlement. During that time, the Board approved a repurchase of 6 million shares of common stock from Capital Z Partners Management, LLC ("Cap Z") for approximately $36 million (the "Cap Z Transaction"). The Plaintiffs allege that such a stock purchase is outside the ordinary course of UAM's business and that UAM's "deliberate actions in prolonging the [Partners] Designee's absence from the [Board] denied Plaintiffs their right to participate in this pivotal business decision that will surely impact the value of Plaintiffs' stake in UAM."[29]

Partners' initial Designee, Katz, was on the Board in August 2013 when it unanimously approved a purchase of "up to $40 million" of its common stock, subject to further approval of specific terms of a purchase.[30] The Board discussed,

[29] Am. Compl. ¶ 17.
[30] Goldstein Aff. Ex. 24.

9

at that time, that all "meaningful shareholders" would have a right to participate in the contemplated repurchase.[31]

On March 14, 2014, UAM's General Counsel spoke to Katz and described two contemplated structures for a purchase of Cap Z's shares at a discount to market price,[32] though he represented that "nothing [was] imminent" with respect to the transaction.[33] Katz did not tell UAM that Plaintiffs were also interested in selling any of their shares at a discounted price,[34] though Katz understood that "when the company was ready to do a transaction, [Plaintiffs] would have a couple of days or a bit longer to make a decision as to whether or not [they] wanted to participate."[35]

On March 20, 2014, UAM sent notice to the directors of a meeting scheduled for March 24, 2014, to discuss the proposed Cap Z transaction. UAM's General Counsel emailed Katz about the transaction, however, Katz resigned that same day and did not attend the Board meeting.[36] On March 28, the Board approved the Cap Z transaction to repurchase 6 million shares at a price of $6.03 per share. Despite the fact that the market price has remained at or above $7.06

---

[31] Stottmann Aff. Ex. 2 at 218:5–10.
[32] Goldstein Aff. Ex 5 at 227:12–230:6.
[33] Stottmann Aff. Ex. 43.
[34] Goldstein Aff. Ex 5 at 230:10–18, 235:10–15.
[35] Stottmann Aff. Ex. 2 at 226:23–227:3.
[36] *See* Goldstein Aff. Ex. 13.

per share thereafter, the Plaintiffs seek monetary damages as a result of having been left out of the repurchase transaction.

*D. Procedural History*

In the first count of the Amended Complaint, the Plaintiffs sought, under 8 *Del. C.* § 225, a determination of the proper composition of UAM's Board. In the second count, Partners and Fund IX/A asserted a breach of contract claim arising out of the Board Seat Agreement, seeking specific performance and damages. By October 2014, the parties settled the specific performance aspect of the breach of contract claim, which also mooted the request for relief under Section 225. Pursuant to the settlement, (1) GTCR and Sperzel signed confidentiality agreements, under which K&E and MNAT agreed to erect ethical walls between Sperzel's counsel and the team handling Partners' defense in the Fraud Litigation, (2) Sperzel was appointed to the Board and (3) Sperzel and GTCR were given written information that had been provided to the rest of the UAM Board during the time between Katz's resignation and Sperzel's seating.[37]

Although I previously expressed my skepticism that there would be any cognizable theory of damages—the specific performance request having been alleviated by the settlement—the litigation continued. UAM filed a Motion for

---

[37] *See* Goldstein Aff. ¶ 6; Pls.' Answering Br. in Opp'n to Def.'s Mot. for Summ. J. at 28.

11

Summary Judgment on December 12, 2014. Following briefing, I heard Oral Argument on March 4, 2015.

## II. STANDARD OF REVIEW

A motion for summary judgment will be granted only if the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[38]

## III. ANALYSIS

In Count II of the Complaint,[39] the Plaintiffs sought specific performance and damages, together with attorney's fees, for breach of the Board Seat Agreement.[40] As noted, the specific performance issue has been resolved, and all that is left before me is a claim for damages and attorney's fees.

---

[38] Ch. Ct. R. 56.

[39] Count I of the Complaint sought relief under 8 *Del. C.* § 225. Because the parties have resolved the issue of the proper composition of the Board, including the seating of Sperzel, this claim is moot and I need not consider it further. *See* Answering Br. in Opp'n to Def.'s Mot. for Summ. J. at 28 n.79 ("Because UAM has agreed to comply with its appointment, nomination, and information obligations under the Board Seat Agreement in the future, Plaintiffs do not oppose dismissal of their § 225 claim (Count I)."); Stipulation and Order Regarding Further Proceedings ¶ 1.

[40] I note at the outset that the breach of contract claims arising under the Board Seat Agreement are governed by New York law. *See* Goldstein Aff. Ex. 3 § E ("This Letter Agreement . . . shall be governed by, and construed in accordance with, the laws of the State of New York . . . ."). The Merger Agreement is governed by Delaware law. *See* Stottmann Aff. Ex. 1 § 8.7 ("All issues and questions concerning the construction, validity, enforcement, and interpretation of this Agreement and the schedules and exhibits hereto shall be governed by, and construed in accordance with, the laws of the State of Delaware . . . ."). The Plaintiffs argue that because the Board Seat Agreement is "Exhibit E" to the Merger Agreement and its execution is a condition to closing, that it is covered by the foregoing language and is governed by Delaware law. However, the explicit invocation of New York law in the Board Seat Agreement itself takes precedence.

*A. The Parties' Contentions*

The Plaintiffs suggest that, to determine whether they are entitled to damages and attorney's fees, I must determine whether there was a breach of the Board Seat Agreement, and whether damages resulted, which (in their view) would require discovery and a trial—all on a matter that has largely been settled by the parties.[41] The parties' contentions as to the breach of contract claim are briefly recounted below.[42]

## 1. Delay in Sperzel's Appointment and Nomination

The Plaintiffs' allegation is that, in not immediately seating Sperzel to the UAM Board without conditions, UAM breached the Board Seat Agreement. That Agreement, the Plaintiffs contend, does not impose any conditions on the Partners Designee, save for the single requirement that the Designee be independent under the relevant stock exchange rules;[43] thus, Sperzel having met that standard, UAM

---

[41] *See, e.g.*, Oral Arg. Tr. 75:22–76:7 ("Well, the settlement obviates the need for you to decide if we get someone on the [B]oard and what the conditions are to putting someone on the [B]oard because we have now reached an agreement on that. But if the refusal to seat him on the [B]oard for the intervening eight months . . . [was a] breach of the parties' contract, then we're entitled to attorney's fees.").

[42] Because of my conclusion, described below, that there was no breach of contract, I need not examine the parties' contentions as they relate to damages or contractual fee-shifting. The basis of the fee-shifting argument, however, is that the Merger Agreement provides for indemnification in the event of a breach of an agreement. I assume for purposes of this Memorandum Opinion that a breach of the Board Seat Agreement would give rise to indemnification. Pursuant to the indemnification provisions, "Losses" arising from a breach of an agreement include reasonable attorney's fees.

[43] As applicable here, the Board Seat Agreement provides, in Paragraph A.1:

The Company hereby acknowledges and agrees that one director designated by [Fund IX/A] who shall satisfy the criteria for "independent director" under the

was in breach of the Board Seat Agreement by attempting to require him to sign a confidentiality agreement prior to seating him on the Board.

The Plaintiffs also argue that, by the terms of the Merger Agreement, the Defendant waived any conflicts of interest arising from K&E's representation of Sperzel. The Merger Agreement provides:

> [F]ollowing the Closing, Kirkland & Ellis LLP may serve as counsel to [Partners], and their respective Affiliates in connection with any matters related to this Agreement and the transactions contemplated hereby, including any litigation, claim or obligation arising out of or relating to this Agreement or the Transactions notwithstanding any representation by Kirkland & Ellis LLP prior to the Closing Date of [Sub] and/or any of its Subsidiaries. . . . [UAM and its merger sub] hereby (a) waive any claim they have or may have that either Kirkland & Ellis LLP has a conflict of interest or is otherwise prohibited from engaging in such representation and (b) agree that, in the event that a dispute arises after the Closing between [UAM], on the one hand, and [Partners], on the other hand, or any of their respective Affiliates, Kirkland & Ellis LLP may represent [Partners] or any of their Affiliates in such dispute even though the interests [Partners] may be directly adverse to [UAM and its merger sub], [Sub] or its

---

rules of the principal stock exchange on which [UAM] Common Stock is listed . . . , shall be appointed to the board of directors of [UAM] effective as of the date hereof. Fund IX/A has previously designated David Katz as its initial [Partners] Designee. Subject to Paragraph A.2, commencing on the date of this Letter Agreement and in accordance with the Amended and Restated Certificate of Incorporation and Amended and Restated By-Laws of the Company, at each annual meeting of the stockholders of the Company . . . , the Company shall nominate for election to the Board one [Partners] Designee, to be included in the slate of directors recommended by the Board to the Stockholders for election.
It further provides, in Paragraph A.3:
    Subject to the other provisions of this Section A, if, as a result of the death, retirement, resignation or removal for cause of the [Partners] Designee, there shall exist or occur any vacancy on the Board, Fund IX/A shall have the power to designate a person to fill such vacancy.
Goldstein Aff. Ex. 3 § A; *see also* Pls.' Answering Br. in Opp'n to Def.'s Mot. for Summ. J. at 32.

14

Subsidiaries and even though Kirkland & Ellis LLP may have represented the [Sub] or its Subsidiaries in a matter substantially related to such dispute.[44]

The Plaintiffs contend that the Partners Designee on the UAM Board is its "affiliate," and thus, that any conflict inherent in Sperzel employing K&E to represent him as a director of UAM was explicitly waived in the Merger Agreement, via the language quoted above. The term "Affiliate" is defined in the Merger Agreement to include,

> with respect to any Person, any other Person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlled" and "controlling" have meanings correlative thereto.[45]

"Any person" includes Partners. Thus, if Sperzel was "controlled by" or "under common control with" Partners, he is an "Affiliate" under the Merger Agreement.

UAM argues that the definition of "Affiliate" cannot include the Designee, as the element of control is lacking: "Indeed, the very notion that a corporate director could be 'controlled' by a single shareholder is repugnant to the law of this state."[46] Further, it argues, the waiver in the Merger Agreement is not broad enough to apply to the Board Seat Agreement, as the waiver provision applies only

---

[44] Stottmann Aff. Ex. 1 § 8.18
[45] *Id.* at 2.
[46] Reply Br. in Further Supp. of Def.'s Mot. for Summ. J. at 18.

15

to "matters related to" the Merger Agreement, which, in the Defendant's view, does not include representation of a Board member seated pursuant, not to the Merger Agreement, but to the Board Seat Agreement.[47]

## 2. Excusal of Performance by UAM

UAM, for its part, argues that, even if it breached the Board Seat Agreement, the Plaintiffs' own breaches of that Agreement excused its performance. Specifically, UAM alleges that the Plaintiffs were in breach when they (1) "directed Sperzel to engage K&E, counsel adverse to [UAM], to advise him in connection with his [UAM] Board service and determined that he would not sign [UAM's] confidentiality agreement,"[48] thus "denying [UAM] the principal benefit of the [Board Seat Agreement]—the service of a loyal director,"[49] and, (2) "when [Fund IX/A and Fund IX/B] did not 'agree to maintain the confidentiality' of [UAM's] information by refusing to sign *any* confidentiality agreement."[50]

In support, UAM relies on this Court's decision in *Henshaw v. American Cement Corp.*[51] In that case, a stockholder-director, Henshaw, of a company sought to inspect the company's books and records.[52] The company had sued one of its other directors, Caldwell, among others, for fraud, and the law firm

---

[47] *Id.* at 19.
[48] Opening Br. in Supp. of Def.'s Mot. for Summ. J. at 24.
[49] *Id.* at 25.
[50] *Id.* at 24.
[51] 252 A.2d 125 (Del. Ch. 1969).
[52] *Id.* at 126.

representing Caldwell was listed among the agents and attorneys designated to make inspections for Henshaw.[53] The company argued that the firm should be prohibited from inspecting the books and records and that Henshaw should be prohibited from disclosing any information obtained by the inspection relevant to the fraud litigation to those defendants.[54] The Court noted:

> The question here is how Henshaw's right to agents and attorneys of his own choosing is to be accommodated to the Corporation's legitimate interest in protecting its position in a lawsuit. I am in no way concerned with the merits of that suit. But it begs common sense and elemental notions of fairness to say that the Corporation must submit its records (including those dealing with the very substance of the fraud suit, the 'Volcanite' transaction) for inspection by a person whose interest in pending litigation is adverse to the Corporation, merely because that person is selected for the purpose as the agent of a director. This would indeed be back-door discovery unbound by work-product, privilege or any other limitation upon discovery. Henshaw's personal preference must here give way to protection of the Corporate interest.

> And the same approach must limit Henshaw in his use of attorneys in the inspection. It is unrealistic, and it might be straining the limits of attorney-client fidelity, to permit the Pillsbury firm to enter into a situation where it would be obligated to two masters with conflicting interests. Thus it has a duty to Caldwell in the prosecution of his counterclaim against Cement (and to the other defendants it represents in the suit). And as an agent or attorney for Henshaw, the director, it would have the same duty he has to Cement.[55]

The Court added:

> Henshaw, as a director, probably has a duty as well as a right to be fully informed as to the 'Volcanite' transaction and the other matters

[53] *See id.* at 129.
[54] *See id.*
[55] *Id.* at 130.

in litigation. And as for disclosure, I emphasize that inspection is here given to Henshaw as a director, with all that implies. He has, as his counsel states, a fiduciary duty to the Corporation and its stockholders with respect to such information that he receives as a director. If he violates that duty, the law provides a remedy.[56]

Drawing upon this language and principle, UAM argues that "Sperzel could not share [UAM's] information with K&E without violating a fiduciary duty to [UAM], but that was precisely what Plaintiffs were demanding he be able to do."[57] Accordingly, the Defendant argues, the Plaintiffs breached the Board Seat Agreement by operation of the "covenant of good faith inherent in that agreement [which] requires Plaintiffs not to deprive [UAM] of the [Partners] Designee's loyal service as a board member."[58]

The Defendant further adds that it was consistent with the Board's fiduciary obligations to delay appointment of Sperzel *until* he signed a satisfactory confidentiality agreement that would preclude sharing UAM's confidential information with defense counsel in the Fraud Litigation. It points to language in the Board Seat Agreement providing that nomination or appointment of the Designee was to be "in accordance with" UAM's Articles of Incorporation and Bylaws.[59] The crux of the argument is that UAM "was not required to put Sperzel

---

[56] *Id.*
[57] Opening Br. in Supp. of Def.'s Mot. for Summ. J. at 26.
[58] *Id.* at 27.
[59] *See* Goldstein Aff. Ex. 3 § A.1. It also points to case law for the proposition that interpreting the Board Seat Agreement to require the directors to elect a Designee "who demands to share

18

on its Board and then wait to see if he in fact conveyed its confidences to adverse counsel, after Plaintiffs insisted that he engage adverse counsel at K&E and refused [UAM's] confidentiality agreement."[60]

To this, the Plaintiffs make several responses, including that the implied covenant of good faith and fair dealing does not apply because the parties' express agreements (including the Merger Agreement and the suggested waiver of conflicts) bear on the subject matter at issue, and that UAM's argument improperly assumed at the outset that the Partners Designee would breach his duty of loyalty to UAM. Partners also argues that UAM acquiesced to and ratified the Partners Designee—specifically, its original Designee, Katz—being represented in his capacity as director by K&E while the parties were adverse. Partners makes a related argument that, if UAM had fiduciary obligations not to allow the Partners Designee to be represented by K&E while UAM and the Plaintiffs were adverse, the UAM directors must have breached those obligations in their acquiescence to Katz's continued service.[61] In addition, the Plaintiffs suggest that these issues raise a number of questions of material fact, precluding summary judgment.[62]

Universal's confidences with adverse counsel would be 'invalid and unenforceable.'" *See* Opening Br. in Supp. of Def.'s Mot. for Summ. J. at 28–29.

[60] Opening Br. in Supp. of Def.'s Mot. for Summ. J. at 29.

[61] See Pls.' Answering Br. in Opp'n to Def.'s Mot. for Summ. J. at 38–45.

[62] *Id.* at 38, 45–47.

*B. Neither Party Breached the Board Seat Agreement*

I do not find that Partners, either in designating Sperzel or in directing him to engage K&E as his counsel, breached the Board Seat Agreement. That Agreement confers upon Partners a right, *but not an obligation*, to designate a member to the Board. Thus, the argument that Plaintiffs breached the Agreement by depriving the Board of a loyal director is without merit.

I also do not find that UAM breached the Board Seat Agreement. The Board, in a faithful discharge of its fiduciary duties, recognized a conflict in the Designee engaging as counsel, in his capacity as a director and *on behalf of UAM*, the same counsel that was *adverse to UAM* in the Fraud Litigation. Partners' argument that UAM waived conflicts by operation of the language in the Merger Agreement is unavailing. The Merger Agreement provided that UAM waived conflicts of interest in K&E's representation of *Partners* in a dispute between UAM and Partners; that is relevant to the Fraud Litigation, but that waiver does not apply to sanction a *UAM director's* representation by counsel where that counsel also represents Partners in a dispute with UAM. Put simply, the conflict between Sperzel's right to counsel of his choosing, and the Board's fiduciary interest in protecting confidential information from conflicted counsel, does not "relate to" the Merger Agreement, and the conflict waiver embodied in that Agreement is inapplicable here. Further, I do not find that the term "Affiliate" includes Sperzel

20

in his capacity as a UAM director.[63] As a director, Sperzel's duties run to UAM and its stockholders, not to Partners.

Importantly, UAM did not outright refuse to seat Sperzel, but instead agreed to seat him once the problem of conflicted representation was solved. That cannot be said to be a breach of the Board Seat Agreement. Nevertheless, the parties resorted to litigation, only later to settle their claim in a way that seems obvious: allow Sperzel to use K&E and MNAT as his counsel with the requirement that the firm create ethical walls between its representation of Sperzel in his capacity as a director and its representation of Partners, GTCR, and the other defendants in the Fraud Litigation.

Because I find that neither party breached the Board Seat Agreement, I need not reach the question of whether Partners has sustained damages by way of lost opportunity to participate in the Cap Z Transaction (unlikely, in the context of the current stock price), or whether either party would be entitled to fee-shifting under the terms of the Merger Agreement.

Finally, the Plaintiffs argued that they are entitled to attorney's fees under the bad faith exception to the American rule, and seek to further develop the record in that regard. It is clear to me, however, that the Board was responding to a legitimate concern when it addressed the conflict created by the proposed

---

[63] What is lacking, I find, is the requisite element of control for purposes of the definition of "Affiliate," as noted above.

representation of a director by a law firm that was also representing a litigation adversary. The record is sufficient for me to find, as a matter of law, that there was no bad faith either in the conduct or in the litigation.[64] Accordingly, I am granting summary judgment and dismissing Count II of the Complaint.

## IV. CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment is granted. An appropriate order accompanies this Memorandum Opinion.

---

[64] Because I am deciding that there was no bad faith, I need not determine whether this issue is governed by New York law—as suggested by the Defendant—or by Delaware law—as suggested by the Plaintiffs—and whether, if governed by New York law, fee-shifting in light of bad faith action or tactics is a viable theory under New York law.

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PARTNERS HEALTHCARE      )
SOLUTIONS HOLDINGS, L.P. and      )
GTCR FUND IX/A, L.P.,      )
     )
          Plaintiffs,      )
     )
        v.      )   C.A. No. 9593-VCG
     )
UNIVERSAL AMERICAN CORP.,      )
     )
          Defendant.      )

## ORDER

AND NOW, this 17th day of June, 2015,

The Court having considered the Defendant's Motion for Summary Judgment (the "Motion"), and for the reasons set forth in the Memorandum Opinion dated June 17, 2015, IT IS HEREBY ORDERED that the Motion is GRANTED.

SO ORDERED:

/s/ Sam Glasscock III

Vice Chancellor